No. 2460.

## EX PARTE GUS SUNDSTROM.

CONSTITUTIONAL LAW—SUNDAY LAW.—Article 186 of the Penal Code, which denounces a penalty against any merchant, grocer or dealer in wares or merchandise, or trader in any lawful business (with certain exceptions) who shall sell or barter on Sunday, is constitutional.

HABEAS CORPUS on appeal from the Criminal District Court of Galveston. Tried below before the Hon. Gustav Cook.

The relator in this case was held under a complaint charging him, as a retail dealer, with selling liquor on Sunday. The several articles of the Penal Code involved in the trial of the questions raised by the relator appear in the brief of his counsel. Upon the hearing of the writ of habeas corpus, the relator was remanded to the custody of the sheriff, and from this order this appeal is prosecuted to this court.

By direction of the court the arguments of counsel on both sides are inserted in full, and they disclose all facts of any significance.

*J. B. Stubbs*, for the appellant: The appellant, Gus Sundstrom, applied to the Honorable Gustav Cook, judge of the criminal district court of Galveston and Harris counties, on the sixth day of October, 1887, for a writ of habeas corpus, alleging, in the usual form, that he was illegally restrained of his liberty by the sheriff of Galveston county. The writ was granted, and upon the hearing it was adjudged that the relator was lawfully restrained by the sheriff, and he was remanded to the custody of that officer to be held pursuant to the warrant of arrest, which was based upon a complaint made before a justice of the peace of Galveston county charging relator with the offense of selling liquor to one W. Cushman on October 3, 1887, the same being Sunday, and the relator being then and there a retail liquor dealer. The warrant and affidavit, as well as the petition, the fiat and the officer's return, appear in the transcript.

It was proven that the applicant is and was on October 3, 1887, a licensed retail liquor dealer in the city and county of Galves-

ton, State of Texas, and as such on said day, the same being Sunday, sold at retail a drink or glass of whisky, the same being an intoxicating liquor, to one W. Cushman, as charged in the complaint, a copy of which is annexed to the application, and is in evidence. Said sale was made in the morning before 9 o'clock. There is an ordinance of the city of Galveston in force and effect, which is as follows:

"No. 9.   An ordinance providing for the punishment of persons selling or bartering on Sunday.

"Be it ordained by the city council of the city of Galveston:

"Section 1.   Any merchant, grocer, or dealer in wares and merchandise, or trader in any lawful business whatever, who shall barter or sell on Sunday, between the hours of 9 o'clock a. m. and 4 o'clock p. m., shall be fined not less than twenty nor more than fifty dollars.

"Sec. 2.   The preceding section shall not apply to the sale of burial or shrouding material, drugs, medicine, ice, milk, newspapers and the sending of telegraph messages."

"Passed under a suspension of the rules at an adjourned regular meeting, August 20, 1885.   Approved August 24, 1885.

"Attest: Daniel J. Buckley, City Clerk.
                                    "R. L. FULTON, Mayor."

It was further proved that a large proportion of the merchants of the city of Galveston, as well as other dealers and other traders, are Jews and of the Jewish religion or faith, which requires the observance of Saturday as a day of rest and cessation from labor and business, just as the Christian religion requires a like observance of Sunday as the Sabbath or day of rest.   The charter of the city of Galveston was also considered in evidence.   It was also proven that there has never been a local option election held in the city or county of Galveston, or any precinct thereof, nor any vote of the voters thereof, for the purpose of determining whether the sale of intoxicating liquor should be prohibited in said city, county or precinct, under the local option laws.

1.   The court erred in holding that the acts of the Legislature of Texas known as the Sunday law were not in conflict with or repugnant to the following provisions of the Constitution of the State, to wit:   Article 1 (Bill of Rights), sections 3, 6, 29; article 3, section 56, clauses 2, 22; article 16, section 20.   All these sec-

tions will appear at length in the brief, as will also the other references herein made.

2.   The court erred in holding that the legislative act or acts, termed the Sunday law, were not in contravention of section 1, amendment 14, of the Constitution of the United States, which provides that no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

3.   The court erred in holding that the relator should be held under the charge made, because it appeared from the evidence that he was a licensed retail liquor dealer of and in the city of Galveston; and that even if the Sunday law, as applied to him and his business, was not a violation of section 20, article 16, of the Constitution, as seeking to prohibit the sale of intoxicating liquor in a manner other than that prescribed by that instrument, still that the State had, by the charter of said city, conferred the power of regulation upon the city of Galveston, and that said city had duly exercised said power by ordinance, which appears in this brief.

Title 7 of the Penal Code of Texas is thus entitled: "Of offenses which affect the free exercise of religious opinion." Chapter 1 of that title is headed: "Disturbance of religious worship." The caption of chapter 2 is "Sunday laws." This chapter is here given in full, as amended by legislative acts since the adoption of the Penal Code.

"Article 183.  Any person who shall hereafter labor, or compel, force or oblige his employes, workmen or apprentices to labor on Sunday, or any person who shall hereafter hunt game of any kind whatsoever on Sunday, within one-half mile of any church, school house or private residence, shall be fined not less than ten nor more than fifty dollars.

"Article 184.  The preceding article shall not apply to household duties, works of necessity or charity; nor to necessary work on farms or plantations in order to prevent the loss of any crop; nor to the running of steamboats or other water crafts, rail cars, wagon trains, common carriers; nor to the delivery of goods by them, or the receiving or storing of said goods by the parties or their agents, to whom said goods are delivered; nor to stages carrying the United States mail or passengers; nor to foundries, sugar mills, or herders who have a herd of stock actually gathered and under herd; nor to persons traveling; nor to ferry men or keepers of toll bridges, keepers of hotels, boarding houses,

restaurants and their servants; nor to keepers of livery stables or their servants, nor to any person who conscientiously believes that the seventh, or any other day of the week, ought to be observed as the Sabbath, and who actually refrains from business and labor on that day for religious reasons.

"Article 185. Any person who shall run or be engaged in running any horse race, or who shall permit or allow the use of any nine or ten pin alley, or who shall be engaged in match shooting or any species of gaming for money or other consideration, within the limits of any city or town on Sunday, shall be fined not less than twenty nor more than fifty dollars.

"Article 186. Any merchant, grocer or dealer in wares or merchandise, or trader in any business whatsoever, or the proprietor of any place of public amusement, or the agent or employe of any such person, who shall sell or barter, or permit his place of business or place of public amusement to be open for the purpose of traffic or public amusement, on Sunday, shall be fined not less than twenty nor more than fifty dollars. The term 'place of public amusement' shall be construed to mean circuses, theatres, variety theatres, and such other amusements as are exhibited and for which an admission fee is charged; and shall also include dances at disorderly houses, low dives, and places of like character, with or without fees for admission.

"Article 186a. The preceding article shall not apply to markets or dealers in provisions as to sales of provisions made by them before 9 o'clock a. m., nor to the sale of burial or shrouding material, newspapers, ice, ice cream, milk, nor to the sending of telegraph or telephone messages at any hour of the day, nor to keepers of drug stores, hotels, boarding houses, restaurants, livery stables, barber shops, bath houses, or ice dealers, nor to telegraph or telephone offices.

"Article 187. The preceding article shall not apply to the sale of drugs and medicines on Sunday."

1. The act above cited in full is inconsistent with and contrary to the constitution of the State, which provides (sec. 3, art. 1) that "All free men when they form a social compact have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments or privileges, but in consideration of public services."

The Sunday law denies eqality of right to the citizen. Certain classes of pursuits are favored by it. Those engaged in the busi-

ness of selling newspapers, ice, milk, ice cream, provisions, and a large number of other avocations and trades, excepted from the operation of the act, may do as they please on that day so far as their callings are concerned; may labor or sell, or not, as they choose; in other words, are freemen; while the rest of the community are placed under the ban of enforced idleness, are denied the privilege of using their labor or property, or of earning a livelihood, and that which is lawful for them to do on six days becomes criminal on the seventh.

The pursuit of occupations licensed by law is, fairly speaking, a public privilege, if not an absolute right. The organic law says that no man is entitled to exclusive separate public privileges, but in consideration of public services. What better right has the newspaper dealer to vend his wares on Sunday than the liquor dealer? And the same question may be asked respecting the other exempted occupations. Is not such discrimination the bestowal of exclusive separate public privileges upon some under no pretense of public service? Is not the denial to others of such privileges contrary to the plain terms of our Bill of Rights: "All free men have equal rights?" The broadest stretch of legislative discretion can not justify such partial and class legislation upon the ground of necessity, well named the tyrant's plea, or of charity, or of the public welfare. It is nothing less than an arbitrary classification under which legislative favorites are granted the rights and immunities that all should be entitled to or none. What would be thought of a law that punished some men for working more than eight hours a day but did not interfere with others? How does this Sunday law differ from it in principle?

If the legislature may exempt about one-half of men's pursuits from the operation of the Sunday law, why could it not exempt all, except, let us say, one calling, that of selling newspapers? Does this court believe that such rank act-framing could pass muster as law under our constitution? What would become of our boasted equal rights, our denial to any set of men exclusive privileges? That charter of our liberty would be worse than "sounding brass"—it would be a dead letter or worse, a living lie, if it could not protect us in that equality of rights, privileges and capacities which, in the language of Judge Cooley, should unquestionably be the aim of the law. That eminent writer holds, as is the law, that every one has a right to be governed by general rules. Those who make the laws "are to

govern by promulgated established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plough."

Distinctions in regulations made for different classes, restricting their rights, privileges or legal capacities, must rest upon some reason upon which they can be defended, such as the want of capacity in infants.  If the legislature should undertake to provide that persons following some lawful trade or employment should not make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict.  To forbid an individual or class the right to the acquisition, use or enjoyment of property in such manner as is permitted to other members of the community would be to deprive them of liberty and equal rights in particulars of primary importance.  (Cooley's Const. Lim., 484, 485, 486; Black's Const. Pro., sec. 54; Ex Parte Westerfield, 55 Cal., 551; Gordon v. Winchester, 12 Bush, 110.  See authorities under second assignment.)

In limitations upon the legislative power are to be found the limitations of the police power.  Whenever an act of the Legislature contravenes a constitutional provision it is void, and it is the duty of the courts so to declare it and refuse to enforce it. (Tiedeman on Police Power, 5.)

How does this act stand when brought to the test of the "exclusive privilege" section of our Constitution?  An act of the Legislature (for it can not be called a law), contrary to the great first principles of the social compact, can not be considered a rightful exercise of legislative authority.  (Tiedeman, 6.)  This is special and class legislation, veiled under the thin guise of police regulation; for it can not be sustained, and no court would have the hardihood to attempt to sustain it, as a recognition of a religious institution.  If the object be the health and tranquility of the public, all should be compelled alike, otherwise the law can not be said to operate equally and impartially.

This statute, in effect, divides the people into various classes, and grants to some the right or privilege of doing business on Sunday, and confers upon them immunity from arrest, but denies it to others and subjects them to punishment.  (Cooley's Const. Lim., 488-494.)

The second assignment is germane to the foregoing, and insists

that this act is in derogation of that provision of the fourteenth amendment to the Federal Constitution, which forbids a State to deny to any one within its jurisdiction the equal protection of the laws. Does this Sunday law do it? Certainly it does as to certain classes or pursuits, and as to all who believe that a day other than Sunday should be observed as a holy day or one of rest.

As was said In re Parrott, United States Circuit Court, California, 1 Federal Reporter, 481, if the State has such power it may prescribe what persons may be employed by corporations organized under its laws, their number, their nationality, perhaps even their creed. It may determine what shall be their age or complexion, their height or weight, the number of hours they shall work in a day or the number of days in a week and the rate of their wages. The act under consideration was one prohibiting all corporations formed under the laws of California from employing Chinese. That case presents a wholesome and instructive discussion of the principles involved in the present one. It cites authorities holding that a court should look to the effect of a statute for the test of its constitutionality. What is the effect of our Sunday law? The Parrott case collates the precedents, deciding that an act passed in pursuance of the police power of the State does not save it if it contravenes the Constitution of the United States. It places the right to labor upon the same plane as the right of property, for property is the offspring of labor. It is, in a sense, as sacred as the right to life, for it is the means whereby we live. The right to preserve it is the most sacred of the rights of man. It quotes Mr. Justice Field in the Slaughter House cases (16 Wall., 97). "The privileges and immunities designated are those which of right belong to citizens of all free governments. Clearly among these must be placed the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons." In Ah Kow v. Nunan, 5 Sawyer, 562, Justice Field also observes: "But in our country hostile and discriminating legislation by a State against persons of any class, sect, creed or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment of the Constitution." (Strauder v. West Virginia, 10 Otto, 303.)

3. But an objection as serious, if possible, and sustained by ample authority, consists in the infringement by the "Sunday law" of section 6, article 1, of our Constitution, which ordains,

among other things, that "no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship."

The facts of this case show that Saturday is the holy day or day of rest of a large portion of the community, and their day of religious observance. This, it seems, was recognized and attempted to be provided for by the law makers so as to avoid giving that preference forbidden by the Constitution, for we find that the article prohibiting labor on Sunday is followed by another which exempts from its operation, among others, "any person who conscientiously believes that the seventh or any other day of the week ought to be observed as the Sabbath, and who actually refrains from business and labor on that day for religious reasons;" but there is no such exception made as to the succeeding article, 186, which undertakes to prohibit certain classes of dealers from selling or keeping open for traffic on Sunday. There is no such exemption allowed in this respect as set forth with regard to laboring on that day. Hence, a preference is given to one religious society and a distinction made, and the believer in the seventh day as a day of rest is discriminated against to the extent of being compelled to remain idle two days in a week if he would obey his religion as well as the law; or, if he would not be at this disadvantage in the struggle of life, he must turn his back on his faith, ignore its behests, and engage on equal terms with his neighbor at bread winning only at the sacrifice of his conscience. To this the law forces him, and thus punishes him for his creed, and gives preference to his neighbor whose religious teachings coincide with the law as to the observance of Sunday. It is difficult to conceive a more glaring violation of the constitutional prohibition short of a union of church and State. This court has no right to supply the omission of the Legislature and add an exemption which it ought to have allowed with regard to selling as well as laboring.

The latest and best writers on such subjects, Cooley and Tiedeman, substantially admit that an act that does not avoid such discrimination or preference is not defensible upon any sound principle, and the courts, where the question has distinctly arisen, have, with rare exceptions, held the same view. In Canton v. Nist, 9 Ohio State, 439, the court held: "The ordinance in question contains no general exceptions in favor of

necessity, charity or creeds. It attempts to compel the observ-
ance of Sunday by Jew and Christian alike. * * * Tavern
keepers and druggists alone are exempted from its operation.
It does not appear from the record that the defendant is a per-
son who conscientiously observes the seventh day of the week
as the Sabbath, but, be that fact as it may, such a plea must
have been unavailing if the second section of this ordinance
be held valid." It was, therefore, adjudged to be void. To the
same effect is the earlier case of Cincinnati v. Rice, 15 Ohio, 225,
which held a like ordinance void.

There is not complete religious liberty when one sect is fa-
vored by the State and given an advantage by law over other
sects. Whatever establishes a distinction against one class or
sect is, to the extent to which the distinction operates unfavor-
ably, a persecution. The extent of the discrimination is not
material to the principle. It is enough that it creates an in-
equality of right or privilege. (Cooley's Const. Lim., 580.)
Such laws "are not so readily defensible by argument, the force
of which will be admitted and felt by all. It is no hardship to
any one for him to abstain from public blasphemy or other
profanity, and none can complain that his rights of conscience
are invaded by his enforced respect to a prevailing sentiment,
But the Jew who is forced to respect the first day of the week,
when his conscience requires of him the observance of the
seventh also, may plausibly urge that the law discriminates
against his religion, and by forcing him to keep a second Sab-
bath in the week, unjustly, though by indirection, punishes
him for his belief." (Cooley's Const. Lim., 589, 590.)

While such a regulation, if it does not extend to a prohibi-
tion of the Jew's religious observance of the seventh day, or to
a compulsory attendance upon Christian worship, may not
amount to direct infringement of his religious liberty, he may
still reasonably claim that it operates indirectly as a discrimi-
nation against his religion by requiring him to respect Sunday as
a day of rest, while his conscience requires of him a like observ-
ance of Saturday. (Tiedeman, 176; Cooley's Const. Lim., 476.)
In some of our States there are statutory exceptions in favor of
those who conscientiously observe some other day of the week
than Sunday as a holy day, and abstain from labor on that day,
and in Ohio it has been held that a statute which did not con-
tain such an exception was for that reason unconstitutional.
(Tiedeman Lim. Police Power, 185.)

The conclusion to be derived from the decision in Johns v. The State, 78 Indiana, 332, is the same, and that case, in its reason and principle, is an unanswerable authority against the validity of the Texas Sunday law, which forbids or punishes selling on Sunday. It sustains such an exception as that mentioned as valid, and the necessary result is that an act without such an exception must be invalid. I quote at length: "It is asserted that an objection against this statute is now urged which has not been presented in any of the numerous cases decided by this court. This objection is that the proviso, which reads thus: 'But nothing herein contained shall be construed to affect such as conscientiously observe the seventh day of the week as the Sabbath,' brings the section under examination into conflict with section 23 of the Bill of Rights. This objection can not prevail. The constitutional provision referred to reads thus: 'The General Assembly shall not grant to any citizen, nor to any class of citizens, privileges and immunities which, upon the same terms, shall not belong equally to all citizens.' The statute under immediate mention does not grant immunities to one class of citizens which, upon the same terms, shall not belong to all. The terms upon which the immunity may be enjoyed are granted to all and denied to none. All citizens accepting these terms may claim the immunity. All who observe the seventh day of the week are entitled to the immunity, provided there is nothing restricting any citizen from enjoying it upon the same terms with all his fellow citizens.

"The framers of the statute meant to leave it to the consciences and judgments of the citizens to choose between the first and seventh day of the week. One or the other of these days they must refrain from common labor. Which it shall be is to be determined by their own consciences. It was not the purpose of the law makers to compel any class of conscientious persons to abstain from labor two days in every week. Without the proviso, which is said to break down the law, a large number of citizens would be compelled to lose two days of labor—one day because of their conscientious convictions of religious duty, and one by the command of the law. We know that there are sects of Christians who conscientiously believe the seventh day to be the divinely ordained Sabbath. We know too, that there is a great people, who, for many centuries, and through relentless persecution and terrible trial, have clung with unswerving fidelity to the faith of their fathers that the seventh

day is the true Sabbath. If the proviso were wrenched from the statute, these classes of citizens would be compelled, in obedience to their religious convictions, to rest from their labor on the seventh day, and, by the law, also compelled to refrain from common labor on the first day of the week. A leading and controlling element of our system of government is that there shall be absolute freedom in all matters of religious belief. The statute here under examination is framed in harmony with this all-pervading and controlling principle. It was meant, not to secure special privilege to any class, but to afford free opportunity to all to observe that day which in their conscientious judgments they believe to be that upon which good men should cease from their labor." The court refers to the Ohio cases which I have cited as sustaining their views, and as entitled to great consideration, not only because they are ably reasoned, but also because the Constitution of Ohio is very like that of Indiana. If this be sound, then the absence of such a proviso would have rendered the act void. This question of the constitutionality of the Sunday law prohibiting a dealer from selling on Sunday, because an exception is not made in favor of those observing Saturday as the Sabbath, and refraining from business on that day, has never arisen in Texas before its courts of last resort, and is an open question.

The case of Gabel v. Houston, 20 Texas, 336, did not touch upon it, nor was it raised in that or any other case. The Gabel case held the Sunday ordinance valid on two grounds. 1. As a police, or civil regulation, for the repose and physical well being of society. 2. As proper to prevent confusion or bustle of business that might distract "a religious set of people" at worship. If this last position be tenable, upon any ground, under our organic law, which I deny, it could only be by placing all sects on an equality and granting to each like protection from possible disturbance on their days and times of public worship. Business should be suspended on Saturday, because then the Israelite and some others worship. It shall cease on all days when the devout catholic attends divine service, which is frequently on week days as well as Sundays, and with many every day. The practical episcopalian observes forty days of Lent, going to church daily. So it is apparent, without much argument or illustration, that the second point in Gabel's case is utterly indefensible. If any person disturbs religious worship at any time let him be punished as our law now provides, but unless he

does so he should be at liberty to go his way in peace. The great maxim, *sic utere tuo, ut non alienum laedas,* underlies this and all other questions of police regulation. As I have said, the question of preference by law to any religious society was not raised in this nor in the Sunday law cases in 30 Texas, nor in Bohle v. The State, 3 Texas Ct. App., 683, nor in the Albrecht and Usener cases, 8 Texas Ct. App., nor elsewhere in this State. It is *res integra,* and the time has come for its decision by this court.

Its invalidity may be invoked by any one, Jew or Gentile, for the taint extends to and vitiates the entire article 186, as is demonstrated in the masterly opinions of Chief Justice Terry and Justice Burnett, in ex parte Newman, 9 California, 502, holding a similar act, or Sunday law, void. It violates as much the religious freedom of the Christian as of the Jew. The principle is the same, and the violation of the constitution follows whether the act compels us to do what we wish to do or what we wish not to do. Our Constitution regards all religions, as such, equally entitled to protection, and all equally unentitled to any preference.

To state the case in another aspect: If the Legislature has the authority to compel those engaged in certain pursuits to desist from them on Sunday (other pursuits not being so restrained), merely as a day of recuperation and rest, it can as well designate another day. Consider it done, and Saturday named as the day, without the privilege extended to the Christian of opening his store or selling goods on Saturday, although he does not do so on Sunday. What would be the result? Would not the article forbidding preference being given by law to any religious society, which is done by discriminating against another in its favor, be at once appealed to? And can any one doubt what the decision of this court would be? In plain, emphatic terms it would denounce the act as a gross, palpable invasion and disregard of that constitutional guarantee which I now here invoke. It is a poor rule that will not work both ways; if the Jews should happen to have a majority or controlling influence in the Legislature, and were to pass such an act as this, forcing the Christian merchant to lose two days in life's busy strife instead of one, or else to stifle his conscience and disobey the requirement of his faith to keep holy the Sabbath day (Sunday), and cease his toils thereon, would not press and pulpit, and platform and bar unite in condemnation of the outrage? What dif-

ference is there in principle between such an act and that which now encumbers our statute book? The question carries its own reply: None.

Then what is the duty of this court under section 29 of the Bill of Rights? It declares that "to guard against transgressions of the high powers herein delegated, we declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto or to the following provisions shall be void."

As to the selection of Sunday as the day of rest, it is argued in State v. Baltimore & Ohio Railroad Company, 15 West Virgina, 362, that it is because the naming of any other day would have imposed unnecessarily onerous obligations on the community, inasmuch as many would rest anyhow on Sunday as a religious duty, and the requirement of another day as one of cessation from work would have resulted in two days being observed instead of one, and thus time would have been uselessly wasted. The same reasoning would lead to our statute (article 186, Penal Code) being held inoperative, because it acts exactly in the way indicated with respect to all but christians of certain sects.

While many authorities may be found in support of Sunday laws of uniform operation, it appears that the courts are by no means agreed on any one principle, and the latest and best exponents of this and like questions, Cooley and Tiedeman, practically disavow that Sunday laws are maintainable on any sound principle as an original question, though admitting the preponderance of decisions. Our courts will have no obstacle of *stare decisis* in the way of a decision upon the point now raised under a law not of uniform operation.

The observance of the Sabbath as a matter of conscience will be found to underlie most of the cases, disguise their leanings as they will. Judges are generally men of christian nurture. Argument is needless to show that it is difficult to divest ourselves entirely of the bias resulting from early impressions. As has been well said: "How slowly the most enlarged and enlightened understandings have practically embraced and carried out the philosophy of perfect religious freedom and toleration. We do not have to go very far back to the times when the best men justified and enforced laws working all kinds of disqualification, punishment and disfranchisement for noncomformity in matters of conscience. But it is time that the law should take

the most advanced ground on these questions, and that the courts should recognize the fact that the cause of true religion is always injured, and never furthered by calling to her aid the sanctions, and penalties, and rewards of secular authority."

Judge Cooley says that Sunday laws are defended only on two grounds: 1. As against desecration of the Sabbath. 2. As a sanitary regulation. He and Tiedeman point out that the first is not warrantable save to actual disturbance of religious worship. Cooley further says: "The Supreme Court of Pennsylvania have preferred to defend such legislation on the second ground rather than the first, but it appears to us that if the benefit to the individual alone" (i. e. the sanitary good) "be considered, the argument against the law which he may make who has already observed the seventh day of the week, is unanswerable."

4. I next ask the court to test the law by that clause of section 56, article 3, of the Constitution of Texas, which prohibits the passage of any local or special law (except on proper notice, etc.), authorizing the regulation of labor, trade, mining and manufacturing. An excellent illustration of the application of this rule will be found in "The Bakers' Case," 55 California, 551, and Earle v. San Francisco Board of Education, 55 California, 449.

5. This Honorable Court are now asked to construe and apply section 20 of article 16 of our Constitution, which is in these words: "The Legislature shall, at its first session, enact a law whereby the qualified voters of any county, justice's precinct, town or city, by a majority vote, from time to time, may determine whether the sale of intoxicating liquors shall be prohibited within the prescribed limits." The Legislature has enacted such a law, known as the local option law, but there has never been a vote taken in Galveston county, or any part of it, to determine whether the sale of such liquors shall be prohibited therein. Relator is a dealer in such liquors in Galveston county and city. Our position is that the Legislature is without power, under the provision just quoted, directly or indirectly, to prohibit the sale of intoxicating liquors in any county in the State. The people may do it by their vote, but the Legislature can not. The Sunday law, therefore, in so far as it infringes the above cited section, and seeks to prohibit liquor dealers from selling their goods one day in the week, or to punish them for so doing, is unconstitutional. Such, in effect, is the principle of Holley v. The State, 14 Texas Ct. App., 505.

The mode prescribed by the Constitut'on for prohibiting such sales is the measure and the limit of legislative right. That method is exclusive. None other can be adopted. Such has ever, without shadow of variableness, been the professional opinion throughout the State; hence the recent attempt to change the organic law in that respect by the adoption of the proposed prohibitory amendment.

Now, if the sale of intoxicating liquor can not be prohibited, save by a local vote, does not the law-making body disregard this inhibition when it prohibits its sale one day out of seven under the guise of a police regulation? If it can prevent the sale one day in the week, why not two, or three, or the whole week? How easy it is to thus fritter away the fundamental rule and strip localities and counties and the whole State from any voice in the matter. Is not prohibition for one day prohibition just the same? Does it make it any the less so because it bases the suppression of the liquor traffic upon the pretext of the necessity for rest and quietude? Let the people change their Constitution if they will, but let not the courts close their eyes to legislative blindness or ignorance. In this peculiar phase the Sunday law has never been considered by any court. It may be that the Constitution is anomalous or faulty in this respect. That may be deemed a misfortune, which, nevertheless, the courts are powerless to remedy.

If the argument be made that the Sunday law does not, by punishing the liquor dealer for selling liquor on Sunday, prohibit the sale of liquor in any such sense as the constitutional convention contemplated in framing section 20, article 16, but that the Sunday law is merely a police regulation, then, we reply, such being the case, the Legislature has already conferred plenary power upon the city of Galveston through and by its charter, a valid act, duly passed to regulate all such matters of mere police regulation. Section 42 of said charter (acts of 1876) authorizes the city council "to license, tax and regulate * * * * drinking houses and saloons, bar rooms, beer saloons, and all places or establishments where intoxicating or fermented liquors are sold." Section 14 empowers the mayor, in his discretion, and "with a view to preserve the peace and good order in said city, to order and enforce the closing of any theatre, ball room, grog shop, tippling house, bar room, or other place of resort, or public room or building."

In pursuance of this authority, the council, in 1885, passed an

ordinance punishing selling, etc., from 9 a. m. to 4 p. m. on Sun--
days, so that if the above provisions of the charter be not in-
valid, and the prohibition of sales of intoxicating liquor on Sun--
day be not prohibition within the meaning of the "Local Option"
section of our Constitution, but merely incidental regulation,
then the subject is already regulated in the city of Galveston,
and as to it the Sunday law does not apply; and as relator sold
intoxicating liquor before 9 a. m. on Sunday, he should be dis-
charged.    (Flood v. The State, 19 Texas Ct. App., 584; Crad-
dock v. The State, 18 Texas Ct. App., 567; Davis v. The State,.
2 Texas Ct. App., 425.)

The most of the questions raised are of first impression in this
State, and that arising under section 20, article 16, of the Consti-
tution, is entirely novel and peculiar to Texas, and relator asks
this tribunal in the exercise of its high functions, to declare his
restraint illegal, and order his dicharge.

*W. L. Davidson*, Assistant Attorney General, for the State: It
is insisted in the brief of appellant that article 186 of our Penal
Code is obnoxious to article 1, sections 3 and 6, and article 3, sec-
tion 56, and also article 16, section 20.  Article 1, section 3, reads
as follows: "All free men when they form a social compact
have equal rights and no man, or set of men, is entitled to ex-
clusive, separate public emoluments or privileges but in conside-
ration of public services."

Section 6 of said article 1 says:  "All men have a natural
and indefeasible right to worship Almighty God according to the
dictates of their own consciences.  No man shall be compelled
to attend, erect or support any place of worship, or to maintain
any ministry, against his consent.  No human authority ought,
in any case whatever, to control or interfere with the rights of
conscience in matters of religion, and no preference shall ever
be given by law to any religious society or mode of worship.
But it shall be the duty of the Legislature to pass such laws as
may be necessary to protect equally every religious denomina-
tion in the peaceable enjoyment of its own mode of public wor-
ship."

Article 3, section 56, subsequently referred to, reads as fol-
lows:  "The Legislature shall not, except as otherwise provided
for in this Constitution, pass any local or special law authorizing
*    *    *    regulating the affairs of counties, cities, towns,
wards, or school districts.    *    *    *    regulating labor,

trade, mining and manufacturing." It is also urged that articles
186a and 187, in connection with article 186, are obnoxious to
these extracts from the Constitution, because they give rights
and immunities to certain named trades and kinds of business.

Are the positions assumed and propositions asserted by appel-
lant sound as questions of law? It is urged that they are not.
It is suggested that articles 186, 186a and 187 of the Penal Code
are legitimate, and were properly enacted by our Legislature
under and by virtue of its police power. Police power is some-
times called the law of overruling necessity. It is often despotic
in its nature and character, commensurate with the sovereignty
of the State, and individual rights of property beyond the ex-
press constitutional limits must yield to its exercise. Upon this
principle health and quarantine laws are established, buildings
torn down or blown up to arrest conflagrations in towns and
cities; markets are purged of infectious articles; parties are for-
bidden to sell unwholesome food; merchandise thrown over-
board from ships infested with pestilence, and nuisances are
abated. "It is the public exigency which demands the summary
destruction, upon the maxim that the safety of society is the
paramount law." "It is the application of the personal right or
principle of self preservation to the body politic." (Potter's
Dwarris, pp. 444, 450, 461.)

"Every sovereign State possesses within itself absolute un-
limited legislative power, except so far as it is prohibited by the
fundamental law." It is limited in its operation only by, and
must have reference to, the welfare, the safety and comfort of
the society, and must not be in conflict with the Constitution.
(Same authority, 458-462; Cooley's Con. Lim., 719, side page 577;
Id., 713-715, side pages 572-574; Tiedeman Lim. Police Power,
1-9.)

Necessity underlies the police power of the State, as the right
of self defense or defense of property does the right of the indi-
vidual to defend that property or life when the necessity arises
or is forced upon him. When the necessity arises, either actu-
ally or apparently, the right of the individual to defend is per-
fect. When the necessity arises for such legislation, either ac-
tually or apparently, the police power of the Legislature is in-
voked at once and legitimately, subject alone to the express re-
strictions of the Constitution. The power and authority to use
it is one thing, and the policy or wisdom of its application in
using it is quite a different thing. This police power lies at the

bottom and is the basis of sovereignty in the State. (Tiedeman Lim. Police Powers, 1–4, 612, 613; Thorpe v. Rutland, etc., R. R. 27 Vt., 140; Cooley Const. Lim., side page, 572; State v. Noyes, 47 Me., 189; Lakeview v. Rose Hill Cemetery, 70 Ill., 192.)

What is necessity in one State, however, may not be in another. This is regulated by many things—public policy, public taste, exigencies pertaining to the peculiarities of people, climate, and many other things. The Legislature is constituted the judge and arbiter of this matter, or these matters. Nearly every State of the Union has constitutional provisions such as quoted hereinbefore. These same States have Sunday laws similar to ours and the one under discussion. These Sunday laws have been held constitutional almost invariably. The reasons assigned for so holding vary with the different States, but still they reach the same conclusion. (Tiedeman's Lim. Police Power, pp. 175–188 and notes; Cooley's Const. Lim., side pp. 476, 478, 588, 594; Specht v. Commonwealth, 8 Penn. State, 312; State v. Ambs, 20 Mo., 214: Commonwealth v. Dextra, 143 Mass., 28–32; Vogelsong v. The State, 9 Ind., 112; Shover v. The State, 10 Ark., 259; Bloom v. Richards, 2 Ohio State, 387; Lindenmuller v. The People, 33 Barb., 548; Ex parte Andrews, 18 Cal., 678; Ex parte Burks, 59 Cal., 6; same case, 3 Crim. Law Magazine, p. 181; Ex parte Roser, 60 Cal., 177; Frolickstein v. Mobile, 40 Ala., 725; Bohl v. The State, 3 Texas Ct. App., 683; Albrecht v. The State, 8 Texas Ct. App., 313; Gobel v. Houston, 29 Texas, 343; 2 Cush., 556, Commonwealth v. Collins; Sunday law cases, 30 Texas, 527; 1 Bish. Crim. Law, sec. 26; 9 Crim. Law Mag., pp. 131, 594, 733; Parker v. The State, 16 Tenn., 476–480.)

The dissenting opinion of Judge Field in 9 California, 502, was adopted in 18 California, 678, which thereby overruled the Newman case in 9 California, 502, cited by appellant. The Andrews case, 18 California, 678, adopting Judge Field's dissenting opinion in the Newman case (9 Cal., 502), has been affirmed in many other later cases in California, the last being Ex parte Burke, 59 California, 6, and Ex parte Roser, 60 California, 177.

I do not place the validity of the Sunday law under discussion on the ground of morality or religion, but simply on the broad ground of police regulation, free of any question of religion, and entirely independent of religious ideas as such, except as those laws may not interfere with such religious questions.

Noisy trades and amusements can be prohibited on Sunday in complete conformity with the limitations of police power. (Tiede-

man's Lim. Police Power, p. 180; State v. B. & O. R. R., 15 W. Va., 362; 36 Am. Rep., 803, 814.) So can noiseless occupations, and the reason calls for the avoidance of a threatened trespass, rather than the prohibition of a direct invasion of right. The apparent danger idea comes in here as an important factor. (Tiedeman's Police Power, pp. 181–183.)

Judge Field's dissenting opinion, afterwards adopted, says: "It is no answer to the requirements of the statute that mankind will seek cessation from labor by the natural influences of self preservation. The position assumes that all men are independent, and at liberty to work whenever they choose. Whether this be true or not in theory, it is false in fact; it is contradicted by every day's experience. The relation of superior and subordinate, master and servant, principal and clerk, always have existed and always will exist. Labor is in a great degree dependent upon capital, and unless the exercise of power which capital affords is restrained, those who are obliged to labor will not possess the freedom for rest which they would otherwise exercise. Necessities for food and raiment are imperious, and exactions of avarice are not easily satisfied. It is idle to talk of a man's freedom to rest when his wife and children are looking to his daily labor for their daily support. The law steps in to restrain the power of capital. Its object is not to protect those who can rest at their pleasure, but to afford rest to those who need it, and who, from the conditions of society, could not otherwise obtain it. The authority for the enactment I find in the great object of all governments, which is protection." (Dissenting opinion of Judge Field in Ex parte Newman, 9 California, 502–518, afterwards adopted in Ex parte Andrews, 18 Cal., 678; Ex parte Burke, 59 Cal., 6; 3 Crim. Law Mag., p. 181; Ex parte Roser, 60 Cal., 177.)

With an ingenuity worthy of a better cause, counsel for appellant has sought to give this case a religious phase, thereby avoiding the real issue. Does article 186 of the Penal Code propose to dictate or control the religion of any citizen of the State of Texas? It does not. It prohibits selling on Sunday as therein set forth; it refers not to religion; it does not prohibit or control religion. What religion, or religious creed or dogma is inculcated in that statute? Or what religion is prohibited? Does it demand any religious act or service, of, or from, any religionist, or non-religionist? Does it require any professed christian of any faith, order, or denomination to do any religious act? Does it require

any non-christian, or non-religionist to do any act of worship, or to support any ministry, build any church or other place of worship, or contribute thereto, or to subscribe to any creed?

Does it oblige any Christian, Jew, Mahomedan, Greek, Infidel, Atheist, Spiritualist, Agnostic, "Scythian, bond or free," to observe any religious form, rite or ceremony, or demand of him that he shall bow the knee to any Deity? If so, what or where or when? Does it enjoin upon any body that he, she or they shall do anything of a religious character at any time or place? Does it ask that any citizen shall believe in the God of the Bible, or its teachings, or the doctrine of the Bible, the Koran, or of Confucius, or the Talmud, or the old or new Testament? Certainly not.

The authority mainly relied on, or at least very confidently relied on by appellant in his able and ingenious brief, is the case of Canton v. Nist, 9 Ohio State, 439, and quoted thus: "The ordinance in question contains no general exceptions in favor of necessity, charity, or creeds. It attempts to compel the observance of Sunday by Jew and Christian alike," * * * The court will find upon a careful examination of the case that the only point decided was that the ordinance in question did not comply with the State law, but was antagonistic to it, and it was held void on that account. The State statute made certain creed exceptions, it seems, and the ordinance omitted the same. The constitutionality of the State law was not alluded to or passed on by the decision. What the ordinance was is not fully shown. To sustain the position that a city can not pass an ordinance antagonistic to the State law, the authority is ample in . Texas, without recourse to other States. (Augerhoffer v. The State 15 Texas Ct. App., 613; Flood v. The State, 19 Texas Ct. App., 584; Bohmy v. The State, 21 Texas Ct. App., 597.)

The same Ohio Supreme Court, speaking of Sunday laws, uses this peculiar language: "We are then to regard the statute under consideration as a mere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that man should refrain from labor at least one day in seven, and the advantage of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, is too obvious to be overlooked." It was within the constitutional competency of the general assembly to require this cessation from labor, and to name the day of rest. It did so by the act referred to, and in

accordance with the feelings of a majority of the people, the Christian Sabbath was properly selected. But, regarded merely as an exertion of legislative authority, the act would have had neither more nor less validity, had any other day been adopted." (Bloom v. Richards, 2 Ohio, 392.) Just so. Had the Texas Legislature selected Tuesday or Wednesday as the day of rest, then what would have become of appellant's conscience? Because Sunday was selected that does not affect the question as to the authority; it could only raise a question as to the wisdom of the choice of the day. It was within the legislative control, and they exercised that control, and can not be governed in the matter. The courts could not, if they would, and would not if they could, control the legislative body in the matter.

Again, the Ohio Supreme Court say further and in the same case, " In support of these views, I might refer to various authorities, but I shall content myself with citing the cases of Specht v. The Commonwealth, 8 Pennsylvania State (Barr), 312, and the City of Charleston v. Benjamin, 2 Strobh., 508. The Constitution of Pennsylvania, like our Constitution of 1802, declared that 'all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship. The Legislature of Pennsylvania passed an act which, among other things, prohibited any person to 'do or perform any worldly employment or business whatever on the Lord's day, commonly called Sunday, works of necessity or charity only excepted.' For a violation of this statute Specht was prosecuted. In his defense he tendered a plea that he was a Seventh Day Baptist, in full communion, and conscientiously believed the seventh day of the week to be the true Sabbath of the Lord, and that he accordingly observed it as such. His plea was overruled, and he was sentenced to pay a fine; to reverse which sentence he prosecuted the suit to which I have referred. On his behalf it was argued that the statute attempted to control or interfere with the rights of conscience, and was therefore unconstitutional. 'It evidently,' said his counsel, 'treats the first day of the week as a holy, a sacred day, and it prohibits labor on that day, not for the purpose of giving

rest to man, as a mere civil regulation, but because it profanes the Lord's day.' But the court held differently." (Bloom v. Richards, 2 Ohio St., 392, 393.) I would further call attention to this case, pages 393-395, as it is directly in point, as I view it. This case is conclusive also, I think, that Canton v. Nist, 9 Ohio State, 439, is not in point, but only decided the question of conflict of the city ordinance with the State law.

In 1878, and before its present amendment, article 186 was before this court, and its constitutionality was passed on. The statute was then assailed for conflict with article 1, section 3, and article 3, section 56 of the Constitution, as in this case, though the religious idea was not breathed into the objections to the law at that time. This court said in that case that "the principle enunciated in the third section of the Bill of Rights is to be found expressed in the same language in each of the constitutions under which the people of Texas have lived since the organization of the State government. (Const. 1845, art. 1, secs. 2, 4; Const. 1866, art. 1, sec. 2; Const. 1869, art. 1, sec. 2.) And under these Constitutions the decisions heretofore rendered, holding Sunday laws constitutional were made by our courts. (Gobel v. Houston, 29 Texas, 346; Sunday law cases, 30 Texas, 527.) The correctness of these decisions is not questioned by counsel for appellant. If they be correct—and of that we are satisfied beyond doubt—then we are of opinion that that is a settlement of the question raised in this case." (Bohl v. The State, 3 Texas Ct. App., 684; see, also, Albrecht v. The State, 8 Texas Ct. App., 314.)

If the Legislature has the power to pass the law setting apart a day of rest, and to call the citizens off from the pursuits and avocations of life for their own protection, and require the law to be observed, does it not follow, as night the day, that the same body can select and set apart the day by virtue of their police powers. The Alabama Constitution provides "that no person within the State shall upon any pretense whatever * * * be hurt, molested, or restrained in his religious sentiments or persuasions, provided he does not disturb others in their religious worship." Chief Justice Walker of that State held: "It is said that the appellant is a pious Jew, whose religious sentiments and persuasions lead him to the conviction that it is his duty to labor six days in the week besides Saturday, and that he is therefore restrained in his religious sentiments or persuasions by a municipal regulation which forbids him to sell goods from

his store on the first day of the week. The law does not hurt, molest or restrain the appellant in the entertainment or expression of what he regards as a religious sentiment or persuasion. It simply prohibits an act which he supposes to be required by a religious duty. It can not be that the Constitution designed to exclude from the prohibitory power of legislation every act which a sentiment or persuasion regarded by any one as of a religious character may dictate. Such a doctrine would lead to the constrained toleration of crime equally abhorrent to the Jew and the Christian."

Further on he says: "The legally constrained abstinence from certain worldly employments on the first day of the week can not be justified upon the ground that such abstinence is enjoined by the christian religion. The Legislature is under constitutional restrictions against compelling the observance of a christian, or jewish, or any other religious institution because it is such. But the Legislature is not prohibited from making municipal regulations because they have the sanction also of a religious society." This, he says, belongs to the police power of the Legislature. "It has its sanction in the teaching of experience that the general welfare and the good of society require a suspension of labor and business for one day in seven, and that that day should be one of uniform observance. The exercise of the power to enforce this theory of public good would not infringe the Constitution, whether the designated day should be the christian or the jewish Sabbath." (Frolickstein v. Mayor of Mobile, 40 Ala., 727.)

In Specht v. Commonwealth, 8 Pennsylvania State, 312, et seq., the court said: "It intermeddles not with the natural and indefeasible right of all men to worship Almighty God according to the dictates of their own consciences; it compels none to attend, erect or support any place of worship or to maintain any ministry, against his consent; it pretends not to control or interfere with the rights of conscience, and it establishes no preference for any religious establishment or mode of worship. It treats no religious doctrine as paramount in the State; it enforces no unwilling attendance upon the celebration of divine worship. It says not to the Jew or sabbatarian, 'you shall desecrate the day you esteem as holy, and keep sacred to religion that we deem to be so.' It enters upon no discussion of the rival claims of the first or seventh days of the week, nor pretends to bind upon the conscience of any man any conclusion upon a subject

which each must decide for himself. It intrudes not into the domestic circle to dictate when, where, or to what god its inmates shall address their orisons; nor does it presume to enter the synagogue of the Israelite, or the church of the seventh day christian to command or even persuade their attendance in the temples of those who especially approach the altar on Sunday. It does not in the slightest degree infringe upon the Sabbath of any sect, or curtail their freedom of worship. It detracts not one hour from any period of time they may feel bound to devote to this object, nor does it add a moment beyond what they may choose to employ. Its sole mission is to inculcate a temporary weekly cessation from labor, but it adds not to this requirement any religious obligation."

Thus spake the Supreme Court of Pennsylvania in Specht v. Commonwealth, 8 Pennsylvania State, 312, et seq. This decision was quoted approvingly by the Ohio Supreme Court in Bloom v. Richards, 2 Ohio State, 387 et seq. These quotations might be so added to as to fill a volume. (See Vogelsong v. The State, 9 Ind., 112; State v. Fernandez, 2 S. Rep., 233; Shover v. The State, 10 Ark., 259; Warne v. The State, 8 Conn., 14; Parker v. The State, 16 Tenn., 476–480; Lundenmuller v. The State, 33 Barb.; Cone v. Collins, 2 Cush., 556; Story v. Elliott, 8 Cow., 27; Com. v. Dextra, 143 Mass., 28–32; Johnston v. Com., 10 Harris, 102; State v. Balt. & O. R. R. Co., 15 W. Va., 362; 9 Crim. Law Mag., pp. 131, 594, 733; 1 Bish. Crim. Law., sec. 268.)

Would not appellant's course of reasoning or line of argument apply with equal force to the election laws of Texas, wherein they require saloons to close on the days on which elections are held? The saloonist could with equal or greater propriety complain of the hardships of such laws, because his saloon is closed and he forbidden to enjoy his property, or to sell his liquors on those days, whereas all other business pursuits are carried on. But here again the true principles underlying the power—necessity and protection—step in and say that the public welfare demands this sacrifice of the saloon man, and he must yield. The Legislature has the authority and power by proper legislation to protect society against the evils that may arise at the polls when great crowds are gathered together. These are exciting times and feelings often run high, and protection to society, the public safety, the public welfare and good order, all combine and require that the laws against selling whisky or liquor on election days be maintained. The State's right of self defense

comes in again, and necessity, as the author of self defense, through the police power of regulation ordains and enacts that the saloons must be closed. Here the State not only asserts her right to act on real danger but also upon apparent danger. The reasons for such laws are apparent. Thus much for appellant's case as urged, and as viewed from his own stand point.

The necessity for the exemptions under our statute can be made to appear with equal facility, but it is not necessary. The Legislature being the sole judge where it has the authority, it has decided the question, and we are left the privilege and duty of obeying and enforcing its determination of it. Then, applying the law as it is argued, and the reasoning as urged, it will be seen that article 186 of the Penal Code is not derogatory to article 1, sections 3 and 6 of the Constitution. What are necessities under such laws varies in the different States according to public sentiment or taste, as indicated by the different legislation in the several States. (Tiedeman Lim. Police Power, p. 187 and note; Hinckley v. Penobscot, 42 Me., 89; Johnson v. Irasburg, 47 Vt., 28; Bosworth v. Swansey, 10 Metc., 364; Conally v. Boston, 117 Mass., 64; Davis v. Somerville, 128 Mass., 594.)

What are works of necessity are different in different States. The Legislature determines the matter. (Davis v. Somerville, 128 Mass., 594; McClary v. Lowell, 44 Vt., 116; Logan v. Matthews, 6 Pa. St., 417; Johnson v. The People, 31 Ill., 469; Texas Penal Code, arts. 186, 186a, 187; Acts 20 Leg., p. 108.) In some States the running of railroad trains and the operation of street railroads are held to be violations of the Sunday laws. (Sparhawk v. Union Pass. R. R. Co., 54 Pa. St., 401; Com. v. Jeandell, 2 Grant Cas., 506.)

Now, is article 186 obnoxious to the Constitution because, as claimed by appellant, it is a local law? The question must be answered in the negative. Referring to article 3, section 56, of the Constitution on this very question, this court said: "For, so far as the other question is concerned, to wit, that the law is obnoxious to the Constitution because it is purely local, take for instance, the definition of a local statute, as quoted by counsel from Bouvier's Law Dictionary, viz., that it is a statute whose operation is intended to be restricted within certain limits, and test the statute complained of by it, and can it be contended that the statute comes within the rule? Are particular limits for its operation specified other than that it is applicable to

towns and cities alone? On the contrary, is it not absurd to say that that is or can be called, technically or legally, a local law which is made for the purpose and applies with equal efficiency to every one of the cities, and every one of the hundreds of towns, scattered over the broad limits, and located in every section and portion and subdivision of the State, not a single county that has a town in it being exempt from its operations? The merchant and trader pursuing his business in every city or town in the State is equally alike subject to its provisions and liable to its penalties. It appears to us that it might with equal propriety be claimed that almost one-half the laws found upon our statute books are local." (Bohl v. The State, 3 Texas Ct. App., 685.)

At the time of the above quoted decision the law narrowed its prohibition to traders and merchants in cities and towns. Since then it has been amended and now includes every merchant and trader in the State of Texas, coming within the purview of that statute. (Acts Twentieth Leg., p. 108.) Therefore the reason is the stronger why it is not a local law within the purview of the Constitution, or in any sense, legally speaking.

One other question should be noticed as made by the appellant: The record discloses the fact that the liquor was sold before nine o'clock a. m. on Sunday, in the city of Galveston, and that Galveston city has an ordinance passed under suspension of the rules at an adjourned meeting of the city council of said city, on August 20, 1885, and approved August 24, 1885. The charter is not a part of the record, and the authority of the city council to pass such ordinances under such circumstances as detailed, is not shown. It seems to be acting under a charter, and not under the general incorporation laws of the State.

However that may be, one thing is apparent, to wit, that the ordinance, if legal, is adverse to the State laws as defined in article 186. That article provides that nothing shall be sold, exemptions excepted of course, during the day; which means, of course, the entire day, by the named parties; whereas, the city ordinance provides that the selling shall not take place between the hours of nine o'clock a. m. and four o'clock p. m. on Sunday. This makes the ordinance void, because of that conflict. Ordinances must yield to the statute laws of the State where there is a conflict between them. (Flood v. The State, 19 Texas Ct. App., 584; Bohmy v. The State, 21 Texas Ct. App., 597; Canton

v. Nist, 9 Ohio State 439; Thompson v. Mt. Vernon, 11 Ohio State, 688.) As the case of Canton v. Nist is reported it decides only the question of the superiority of the statute law of the State over the ordinances of a city with reference to the same subject matter. It is in harmony with the decisions of this State, as above cited.

Another theory of appellant is, that, as he sold the liquor before nine o'clock a. m., the city ordinance will shield him from punishment under the statutes. As we have seen above, the city ordinance, being in conflict with the statute, must yield, and under the authority of Canton v. Nist, cited by appellant, he is in error.

Another proposition asserted by appellant is that, as article 16, section 20, of the Constitution requires the Legislature to pass laws to authorize subdivisions of the State and counties to vote on the question as to prohibiting the sale of liquor in said subdivisions of territory, therefore the Legislature can not regulate its sale or control its traffic in any way, except by virtue of said article 16, section 20. The theory of appellant is that the said article 16, section 20, and the legislation thereunder, should control the question of the liquor traffic of the State to the exclusion of all legislative regulation of said traffic except under and by virtue of said article and section. This question was before this court in ex parte Bell, 24 Texas Court of Appeals, 428, and was there decided adversely to the position assumed. That case is directly in point. Bell brought his writ of habeas corpus to test the constitutionality of the act of 1887 (General Laws, p. 58), amendatory of former acts of the Legislature. He admitted non-compliance with that law and all necessary facts, and hinged his case on the constitutionality of the law, from the stand point that said act was prohibited by article 16, section 20, of the State Constitution.

The court held the position untenable, refused the writ, and remanded the relator to custody. This, as I view it, settles the question and holds that the said article and section do not limit the power of the Legislature on any question in which the liquor traffic may be presented, save and except to absolutely prohibit its sale or where the local option happens to be in force. (Ex parte Bell, 24 Texas Ct. App., 428.) This same view has always been held by this court. The local option law, where it is in force, operates as a sort of supersedeas upon the general laws of the State regulating the sale of liquor in the given territory, but

as soon as the local option law is repealed, the State laws operate at once. Where local option is in force, liquor is at once prohibited to be sold. But suppose the law is repealed or set aside by a proper vote, then what? A party can not sell. Before he can sell he must comply with the State laws, pay his taxes, give his bond, and take out his license. (Robertson v. The State, 5 Texas Ct. App., 160; Boon v. The State, 12 Texas Ct. App., 184; Ex parte Bell, 24 Texas Ct. App., 428.)

WILLSON, JUDGE. Applicant Sundstrom being held in custody by the sheriff of Galveston county under a warrant of arrest issued upon a complaint charging him with selling liquor on Sunday, he being a retail liquor dealer, he sued out a writ of habeas corpus before the Honorable Gustav Cook, judge of the criminal district court. Upon a hearing of said writ Judge Cook remanded applicant to the custody of said sheriff, and from said judgment applicant appealed to this court. At the last term of this court at Tyler said judgment was affirmed.

Applicant, by his counsel, filed a motion for rehearing, accompanied by an able and elaborate brief and argument, assailing the constitutionality of the law under which the applicant was being prosecuted, to wit, article 186 of the Penal Code. This motion was taken under advisement and transferred to this branch of the court in order that the questions presented might be thoroughly examined into, and that the Assistant Attorney General might have the opportunity of replying to the brief and argument of counsel for applicant. The Assistant Attorney General has filed a brief and argument in which he has fully, and to our minds, satisfactorily and conclusively answered the propositions, arguments and authorities advanced by counsel for the applicant. He has cited and reviewed the decisions bearing upon the questions, and we find upon examination that his conclusions are fully supported by the authorities. It would be a useless consumption of time on our part to enter upon a discussion of the questions involved, which discussion would be necessarily lengthy, when they have been so ably and exhaustively discussed by the Assistant Attorney General. We shall therefore content ourselves by referring to and adopting his brief as our opinion in this case.

The motion for rehearing is overruled.

*Overruled.*